This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellants, Robert and Robin Tate, appeal the decision of the Summit County Court of Common Pleas, Juvenile Division, adjudging their minor son, Joseph Lee Tate, to be a neglected child. We reverse.
 I.
Robert and Robin Tate are the parents of Joseph Tate, who was born on January 5, 2000. On May 24, 2000, Summit County Children Services Board ("CSB") filed an affidavit alleging that Joseph was a dependent and neglected child and requesting emergency temporary custody. In the complaint, CSB alleged that emergency temporary custody was necessary because the Tates had failed to comply with the child safety plan, they had episodes of domestic violence, Ms. Tate used both drugs and alcohol, and Mr. Tate was arrested on a felony warrant. On the same day as the complaint was filed, the juvenile court granted an ex parte order of emergency temporary custody. After the shelter hearing on May 25, 2000, the magistrate ordered that Joseph remain in the emergency temporary custody of CSB, and Joseph was eventually placed in foster care.
A hearing was held before a magistrate on August 21, 2000 to determine whether Joseph was neglected and/or dependent, pursuant to R.C. 2151.03
and 2151.04 respectively. In an order journalized on August 25, 2000, the magistrate found by clear and convincing evidence that Joseph was a dependent child because Ms. Tate's "mental and physical state [at the time of the Juvenile Rule 6] resulted in Joseph lacking adequate parental care." The magistrate, however, dismissed the allegations of neglect. Accordingly, Joseph was placed in the temporary custody of CSB.
On August 25, 2000, the juvenile court conditionally adopted the decision of the magistrate, but allowed the parties time to file written objections to the decision. The court stated that the filing of timely written objections would act as an automatic stay, pending the court's consideration of the objections. The Tates subsequently filed written objections to the magistrate's decision, claiming that the magistrate erred in determining that Ms. Tate suffered from a mental condition at the time she placed Joseph in Fawn Tate's care, causing Joseph to be dependent. The juvenile court agreed, and in a judgment journalized on January 8, 2001, sustained the Tates' objections to the magistrate's decision and dismissed the allegation of dependency; however, the court proceeded to adjudicate Joseph a neglected child, finding that Joseph's "parents neglected or refused to provide proper or necessary subsistence, education, medical or surgical care or treatment or other care necessary for the Child's health, morals or well-being." See R.C. 2151.03(A)(3). The juvenile court stated that
 [a]mong the bases for a finding of neglect are: Parents' failure to comply with the safety plan due to Father's incarceration on May 24, 2000 and due to Mother's intoxication and admission to detoxification by the authorities on February 23, 2000; Parents' failure to secure proper medical care for Child; and Parents' relocation to another state thereby making CSB's monitoring of Parents' compliance with the safety plan impossible.
This appeal followed.
 II.
Appellants assert three assignments of error. We will discuss each in due course, consolidating his first and third assignments of error to facilitate review.
 A. Second Assignment of Error THE JUDGE'S ORDER THAT THE MINOR CHILD JOSEPH TATE BE ADJUDICATED A NEGLECTED CHILD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In their second assignment of error, the Tates challenge the weight of the evidence by which the juvenile court adjudged Joseph to be a neglected child. We agree.
A finding of neglect must be supported by clear and convincing evidence. R.C. 2151.35(A) and Juv.R. 29(E)(4). In reviewing a juvenile court's adjudication of neglect, this court must determine whether the juvenile court had before it clear and convincing evidence that the child was neglected. See In re Jones (May 2, 2001), Summit App. No. 20306, unreported, at 8. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
R.C. 2151.03(A)(3)[1] defines a neglected child as "any child * * * [w]hose parents * * * neglect the child or refuse to provide proper or necessary subsistence, education, medical or surgical care or treatment, or other care necessary for the child's health, morals, or well being[.]"
On January 5, 2000, Joseph was born slightly prematurely at thirty-six weeks. Shortly after the birth, both Joseph and Ms. Tate tested positive for cocaine. The hospital contacted CSB, and Brenda Keener, a caseworker for CSB, was assigned the case. Ms. Tate testified that prior to CSB's involvement, however, Ms. Tate had voluntarily made an appointment with the Community Drug Board because she was devastated that Joseph had been born prematurely.
Ms. Keener met with the Tates on January 6, 2000 and noted that both parents were very sympathetic in response to the referral, and that Mr. Tate related that he did not know that Ms. Tate had used cocaine during the pregnancy. Ms. Keener stated that CSB would have normally removed Joseph pursuant to Juv.R. 6; however, as both parents were very sympathetic and willing to work cooperatively with CSB, CSB decided to institute a safety plan instead. Under the safety plan, 1) Ms. Tate was to remain clean of drugs and alcohol and attend weekly AA/CA/NA meetings, 2) Ms. Tate was to keep her Community Drug Board ("CDB") appointment and follow all recommendations for treatment, and 3) Mr. Tate was to act as "main caretaker" of Joseph until Ms. Tate completed a treatment program. Ms. Keener testified that the portion of the safety plan that required Mr. Tate to act as Joseph's main caretaker meant that a responsible adult, not necessarily Mr. Tate, needed to supervise Ms. Tate while she was caring for the baby. The Tates voluntarily signed the safety plan on January 7, 2000.
On January 27, 2000, Dr. Douglas Lefton, a physician at Fairlawn Family Practice, first saw Joseph. He testified that according to the hospital's discharge summary, Joseph was septic at birth but was discharged in good condition after treatment. He related that at the January 27, 2000 appointment, Joseph seemed healthy and that the Tates were very concerned about the baby and cared very much for him. Consequently, Dr. Lefton expressed disappointment when the Tates missed two regularly scheduled visits. Ms. Tate testified that she missed those appointments because she was arranging the funeral, and then attending the funeral, for Mr. Tate's aunt. Although the Tates missed the first well-child care appointment scheduled for March 10, 2000, they brought Joseph to see Dr. Lefton on March 20, 2000 because Joseph had cold symptoms. At that time, Dr. Lefton was able to give Joseph his two month immunizations. Ms. Tate also pointed out that Dr. Lefton was not the only physician who treated Joseph. For instance, Ms. Tate stated that Joseph had also been treated at the Family Practice Center in Mahoning County for reflux problems caused by his formula.
At the hearing, Mr. Tate admitted that the police had been called to his home regarding complaints of domestic violence on more than one occasion, and that he was arrested on March 1, 2000 for violating a temporary protection order when he went to the residence of his former wife, Fawn Tate.
Pursuant to CSB's requests under the safety plan, Ms. Tate submitted to random drug tests, which were all negative. Ms. Tate paid for all of her treatment herself, including the drug screens. There was only one time in February 2000 that Ms. Tate did not drop urine pursuant to CSB's request. Ms. Tate explained that she did not drop urine that day because her family was going out of town to look for another place to live. Around the same time in February 2000, the Community Drug Board's progress notes reflected that Ms. Tate became intoxicated and was admitted to detoxification over one weekend. Ms. Tate testified that she had not taken drugs since January 2000. Similarly, Ms. Keener admitted that the drug tests indicated that Ms. Tate had not used drugs since January 2000, but noted that she was unable to monitor the Tates' compliance with the safety plan when they relocated to West Virginia in March 2000. Importantly, Ms. Keener disclosed that none of the referrals against the Tate family had been substantiated.[2]
While the Tates were in West Virginia, Ms. Tate did not appear for Community Drug Board appointments to submit urine samples and attend counseling in Summit County. During that time, CSB was unable to locate the Tates. As such, Ms. Keener was going to close the case due to her inability to locate the Tates. In May 2000, the Tates moved again, this time to Trumbull County, Ohio. Even though Ms. Tate stopped attending counseling sessions with the Community Drug Board in Summit County, Ms. Tate continued to receive counseling at Valley Counseling Services in Trumbull, Ohio. Ms. Tate testified that as of the date of the hearing, her counselor recommended that she attend counseling only on an "as needed" basis. Ms. Keener, however, has been unable to assess Ms. Tate's progress at Valley Counseling Services because Ms. Tate has refused to sign the appropriate releases.
On or about May 24, 2000, Mr. Tate was arrested for mail fraud. At approximately 1:30 a.m. on May 24, 2000, Ms. Tate, Larry Erb,[3] and Joseph drove to the residence of Fawn Tate, Mr. Tate's ex-wife. When they arrived, Ms. Tate went to speak with Fawn, leaving Joseph in the care of Mr. Erb. According to Ms. Tate, she asked Fawn if she would be willing to take care of Joseph for a couple of days, while Ms. Tate attempted to get Mr. Tate released from jail. Fawn apparently agreed, and Ms. Tate gave her Joseph's clothes, food, diapers, and bathing accoutrements, as well as $150.00 to watch Joseph. Ms. Keener testified that Ms. Tate believed Fawn to be a capable adult. Ms. Tate then left Joseph in Fawn's care and returned home with Mr. Erb in order to get Joseph's bassinet and swing, as there was no room for these items on the first trip. After Ms. Tate left, Fawn (or her sister) contacted CSB stating that she was unable to care for Joseph. At that time, CSB took custody of Joseph. Shortly thereafter, Ms. Tate returned to Fawn's residence with the bassinet and swing. At that time, the police told her that they had a warrant for her arrest, handcuffed her, and placed her in a police cruiser. In fact, there was no warrant for her arrest, and she was released. The next day, Ms. Tate submitted to a drug test and tested negative for drugs. According to Ms. Tate, Fawn never returned the $150.00. At the time of the hearing, Mr. Tate was under house arrest due to the federal mail fraud charges.
Additionally, Ms. Tate testified that she has steady employment and adequate financial resources with which to care for Joseph. Significantly, Ms. Keener testified that the Tates properly clothed, fed, and cared for Joseph. Additionally, she stated that they had a well-maintained home and "all the belongings for the baby." Even though Joseph was in foster care at the time of the hearing, Ms. Tate continued to purchase clothes, diapers, toys, and food for Joseph.
As previously discussed, CSB was required to prove neglect under R.C.2151.03(A)(3) by clear and convincing evidence. See R.C. 2151.35(A) and Juv.R. 29(E)(4). After thoroughly reviewing the record, we conclude that the juvenile court's finding that the Tates "neglected or refused to provide proper or necessary subsistence, education, medical or surgical care or treatment or other care necessary for [Joseph's] health, morals or well-being," and consequent determination of neglect pursuant to R.C.2151.03(A)(3), was not supported by clear and convincing evidence. The Tates' second assignment of error, therefore, is sustained.
 B. First Assignment of Error THE JUDGE ERRED IN REVIEWING THE MAGISTRATE'S DISMISSAL OF NEGLECT AFTER SHE HAD ACCEPTED THE DISMISSAL IN HER AUGUST 25th, 2000 JUDGMENT ENTRY BECAUSE THERE WAS NO OBJECTION ON THE ISSUE OF NEGLECT PENDING, NEGLECT WAS NOT PROPERLY BEFORE THE COURT FOR CONSIDERATION, AND THE JUDGE RELIED ON EVIDENCE OUTSIDE OF THE RECORD IN MAKING HER FINDING OF NEGLECT.
 Third Assignment of Error THE REVIEWING JUDGE ABUSED HER DISCRETION BY OVERTURNING THE MAGISTRATE'S DECISION TO DISMISS THE ALLEGATIONS OF NEGLECT AND BY FINDING THE MINOR CHILD TO BE NEGLECTED.
In their first assignment of error, the Tates argue that the juvenile court erred in finding neglect after it had conditionally adopted the magistrate's decision on August 25, 2000.[4] The August 25, 2000 decision adopting the magistrate's decision was conditioned upon written objections being filed by the parties. The juvenile court wrote that the timely filing of written objections would operate as an automatic stay of execution of the August 25, 2000 judgment, pending the juvenile court's resolution of the objections. The argument follows that, as CSB did not file objections to the magistrate's dismissal of the neglect allegation and the juvenile court had adopted the magistrate's decision contingent upon objections being filed, the juvenile court was limited to considering only the Tates' objections to the magistrate's determination of dependency and could not revisit the issue of neglect.
In their third assignment of error, the Tates aver that, when the juvenile court vacated the magistrate's dismissal of the allegations of neglect, the juvenile court erred because it substituted its judgment for that of the magistrate; essentially, the Tates contend that the juvenile court erred in finding that the magistrate had abused its discretion regarding her dismissal of the neglect allegation.
This court need not address these assignments of error, as they have been rendered moot by our disposition of the Tates' second assignment of error. See App.R. 12(A)(1)(c).
 III.
Appellants' second assignment of error is sustained. Their first and third assignments of error have been rendered moot. Accordingly, the judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed and the cause is remanded for further proceedings consistent with this decision.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellee.
Exceptions.
 _______________________________ WILLIAM G. BATCHELDER
WHITMORE, J. CONCURS.
[1] Although the juvenile court's judgment entry does not explicitly state which provision of R.C. 2151.03(A) applied, the language used in reaching its holding, see infra, is virtually identical to R.C.2151.03(A)(3). In its appellate brief, CSB relies on R.C. 2151.03(A)(2) in support of the neglect determination. CSB, however, did not cite this section as a reason for Joseph being neglected in the complaint filed on May 24, 2000, and the juvenile court did not rely on this section in reaching its decision.
[2] At least one of the referrals was made by Mr. Tate.
[3] Larry Erb is a family friend who resided with the Tates in Trumbull County.
[4] The August 25, 2000 judgment entry states in part:
 UPON REVIEW OF THE MAGISTRATE'S DECISION, HAVING FOUND NO ERROR OF LAW OR OTHER DEFECT ON THE FACE OF THE DOCUMENT, PURSUANT TO JUVENILE RULE 40(E)(4), THE COURT ADOPTS THE DECISION OF THE MAGISTRATE.
 THE PARTIES HAVE THE RIGHT TO FILE WRITTEN OBJECTIONS TO THE DECISION WITHIN FOURTEEN (14) DAYS OF THE FILING DATE OF THE DECISION. THE FILING OF TIMELY WRITTEN OBJECTIONS SHALL OPERATE AS AN AUTOMATIC STAY OF EXECUTION OF THIS JUDGMENT, PENDING THE COURT'S RULING ON THOSE OBJECTIONS.